THE DUKE OF CUMBERLAND and others *against* CODRING-
TON and others.

Where a person takes a conveyance of land subject to a mortgage, covenanting *December* 31.
to indemnify the grantor against the mortgage, and having paid off part of
the incumbrance, dies intestate, the land is the primary fund to be resorted
to for payment of the residue, and the heir cannot throw the charge upon the
personal representatives.

If the purchaser has even rendered himself liable, at law, to the mortgagee, or
creditor, for the payment of the debt, this circumstance will not be sufficient
to change the natural course of *assets;* there must, also, be proof of strong
and decided intention to subject the personal estate to the charge.

By an express direction in his will, or by disposition, or language equivalent
to an express direction, the purchaser may throw the charge upon his per-
sonal assets.

If the purchaser, having subjected his personal estate to the charge, dies, and
the land descends to his heir, who is, also, his personal representative, al-
though the personal funds of the ancestor, in the hands of the heir, were lia-
ble for the debt, yet, on the death of the heir, his personal assets are not the
primary fund for payment.

IN the beginning of the year 1791, Sir *William Pulteney*,
for himself, and for *Wm. Hornby*, and *Patrick Colquhoun*,
purchased of *Robert Morris*, of *Philadelphia*, a large tract
of land in this state, called, in the case made by consent of
parties, the " *Genesee Tract,*" in which Sir *William* was
interested in three-fourths; but as he and the other pur-

CUMBERLAND
v.
CODRINGTON.

chasers were aliens, a conveyance was not made to them. After the sale, the proprietors of the tract duly appointed *Charles Williamson*, a *Scotchman*, their agent, who removed to this country, became naturalized, and procured from *Morris* and his wife, an absolute conveyance of the tract to himself, in fee. Having thus obtained the legal title, *Williamson* entered into a variety of extensive speculations, both in relation to the *Genesee Tract*, and other objects, by which he became greatly involved in debt, and his drafts upon his employers, which they had, for several years, been in the habit of paying, increasing greatly in amount, they refused any longer to accept his bills, and attempted to bring his agency to a final settlement, and to obtain a division, and conveyances of the land from him, as they were, at this time, enabled to hold real estate, by virtue of an act of the legislature of the 2d of *April*, 1798. This act, however, was limited, in its duration, to three years, and *Williamson* refused to convey their respective proportions to the different proprietors, except on the payment, from each, of very large sums of money. To obtain a conveyance, and to prevent the land from being sold by the creditors of *Williamson*, on the judgments which they would have obtained in the suits against him, *Robert Troup*, one of the defendants, who was employed by Sir *W.* as his agent in this transaction, induced *Williamson* to convey the lands to Sir *W.*, for a nominal consideration, but upon certain terms, by deeds which were delivered as escrows, and persuaded *Williamson's* creditors to stay proceedings in their suits, until it could be known whether Sir *W.* would accede to those terms, which were to pay *Williamson* a large sum for his services as agent, and to assume the payment of his debts, several of which were secured by mortgages on the premises conveyed. The deed of conveyance, immediately after the *habendum*, contained the following clauses: "Subject, nevertheless, to the operation and charge of all mortgages heretofore executed by the said *C. Williamson*, and now existing as liens on the said

parcels, or tracts of land, and premises hereby granted and released, or any parts or part thereof. And upon the express condition, nevertheless, that the said Sir *W. Pulteney*, his heirs and assigns, shall ratify, confirm, and carry into effect, in like manner as the law would require the said *C. Williamson* and his heirs to do, in case this present grant and release were not made, all and each of the leases, contracts, agreements, or covenants, of whatsoever nature, at any time, or times, heretofore made, or entered into by the said *C. W.*, with any persons, or person, whomsoever, of or concerning the same parcels or tracts of land and premises hereby granted and released, or intended to be granted and released, or any parts or part thereof." Sir *W.* accepted the terms which had been proposed; and, accordingly, executed two indentures, bearing date, respectively, the 23d of *July*, 1801, which were received by *Williamson* as a full compliance with the conditions of the escrow.

By one of these indentures, Sir *W.* covenanted with *Williamson*, that he, Sir *W.*, and his heirs, executors, and administrators, should, and would, from time to time, and at all times thereafter, well, truly, and sufficiently indemnify, and save harmless, the said *Williamson*, his heirs, &c. from all actions, &c. by reason, or on account of two bonds and mortgages, dated, respectively, the 1st of *December*, 1796, executed by *Williamson* and *Thomas Morris* to *Andrew Craigie*, each conditioned for the payment of 25,000 pound, *New-York* currency, with interest, on or before the 8th of *October*, 1806; and from another bond and mortgage, dated the 2d of *September*, 1800, conditioned for the payment of 10,000 dollars, in three years from the date, with interest, executed by *Williamson* and *Dudley Walsh* to *George Wray;* and on account of the balance due on another bond and mortgage, dated the 13th of *January*, 1796, executed by *Williamson* to *John Joy*, for the payment of 30,000 dollars, with interest.

A settlement having thus been made with *Williamson,* he was suspended in his agency, to which the defendant *Troup* was duly appointed, by letter of attorney, and made several payments on account of the principal and interest due on the bonds and mortgages above mentioned ; one of those to *Andrew Craigie,* having been by him assigned to *Bossinger Foster,* and the other having been purchased by Sir *W.,* in *London,* at a discount. In *May,* 1805, Sir *W.* died intestate, leaving a daughter, *Henrietta Laura Pulteney,* Countess of *Bath,* his only child, who succeeded to all his real property, as heiress at law, and took out administration, in *Great-Britain,* on all her father's personal estate in that country. The Countess had previously married with Sir *James Pulteney,* one of the defendants in the original bill in this cause, but by the marriage contract had reserved to herself the absolute controul and disposal of the estates, real and personal, which she might acquire, with power to make a will. *Troup* was duly appointed by the Countess her agent, and took out letters of administration on the personal property of Sir *W.* in this state. He also proceeded, with the approbation of the Countess, to make payments on account of the before mentioned bonds and mortgages, and entirely discharged those executed to *Joy* and *Wray.*

*Bossinger Foster,* the assignee of one of the bonds and mortgages to *Craigie,* died sometime in the year 1805 ; and in *October* of that year, a correspondence was commenced by the defendant, *Mary Foster,* his widow and administratrix, with *Troup,* in relation to the payment of the interest due on the bond and mortgage assigned to her husband, which continued between *Troup* and Mrs. *Foster's* agent, until *November,* 1807, and resulted in an engagement by *Troup,* in the lifetime of the Countess, in his character both of administrator and agent, to pay the principal and interest due on the bond and mortgage, out of the proceeds of the *Pulteney* estates, as fast as they should come

to his hands, provided Mrs. *Foster* would forbear to pro-
secute for the recovery of the debt. With this engage-
ment Mrs. *Foster* rested content, and did accordingly for-
bear to prosecute; but as she seemed to be greatly in
want of the balance due to her, and the proceeds of
the estate came in but slowly, *Troup* conceived that he
would not be able eventually to pay the debt out of these
proceeds, within the period that might be limited by Mrs.
*Foster's* exigencies. Under this impression, in *October*
and *November*, 1807, he wrote to the Countess, requesting
permission to draw bills upon her, but these, and his sub-
sequent communications on the subject, were not an-
swered by the Countess, or her agent in *England*, as she
was, at the time, in an ill state of health, and incapable of
attending to business, and afterwards died, in *July*, 1808,
without issue, having made her will, by which she gave
her personal estate to Sir *Thomas Jones*, who was one of
the defendants in the original bill, but is since deceased, to
the defendant *Codrington*, and another person, in trust, and
appointed them her executors; but the two former only
undertook the execution of the will, and her real estate
descended to Sir *John Lowther Johnstone*, as her heir at
law, who was plaintiff in the original bill, but is since de-
ceased.

In *August*, 1808, after the death of the Countess, and be-
fore it was known to him, *Troup* procured his own notes for
30,000 dollars to be discounted at one of the banks in the
city of *New-York*, and paid that amount on account of Mrs.
*Foster's* bond and mortgage, and for the payment of the
residue, drew a bill, for 11,000 pounds sterling, upon the
Countess, in favour of *H. Waddington*, of *London*, one of
the firm of *J. Waddington*, & Co. of *New-York*. The bill
was confided to *J. Waddington* & Co. to be remitted by
them to *H. Waddington* for acceptance and payment;
under an agreement, that when it was paid in *London*, Mr.
*Troup* should be at liberty to draw on *H. Waddington* for

1817.

CUMBERLAND
v.
CODRINGTON.

the amount. On its arrival in *London*, the bill was neither accepted nor paid, owing to a dispute between the personal and real representatives of the Countess, the former contending that the balance due on Mrs. *Foster's* bond and mortgage was payable out of the mortgaged premises ; and the latter, that it was a charge on the personal assets of the Countess. The agency both of the real and personal estate was continued in Mr. *Troup*, by the respective representatives.

In consequence of the death of Sir *John Lowther Johnstone*, the original plaintiff, and two of the defendants, after publication had passed, and before the cause was set down for hearing, the suit was abated ; and a *bill of revivor* was filed by the Duke of *Cumberland*, Earl *Manners*, Lord *Allavay*, and *Masterton Ure*, the present plaintiffs, who are the devisees of Sir *J. L. Johnstone*. *Troup*, by his answer to the bill of revivor, admitted that he had sufficient assets to pay the mortgage debt, should the Court decree it to be paid out of the personal estate.

*Harison* and *Hoffman*, for the plaintiffs. It cannot be disputed, but that if the debt in question had been originally contracted by Sir *W. P.*, or the Countess, the real representatives would have been entitled to the relief which they now seek, unless a contrary inference could be deduced from the will of the Countess ; but no such inference is in this case pretended. (2 *Fonbl. Tr. Eq.* 290.) Nor is it contended, that they can transfer the burthen to the personal representatives, unless circumstances can be shown to warrant the inference, that it was the intention of the original parties to make the debt their own. (2 *Fonbl. Tr. Eq.* 291.) The *intention* of the party from whom both the funds proceed, is the governing principle. *Pockley* v. *Pockley*, 1 *Vern.* 36.) If it were a debt of his own contracting, he must manifest his intention to exempt his personalty, the primary fund for payment ; if it were

the debt of another, he must do some act evincing his design to regard it as his own, and disturb the natural course of the two species of assets; otherwise, the heir who takes the estate, takes it with the burthen to which it was subjected. Upon these acknowledged principles, courts of equity have uniformly proceeded, or professed to proceed; and where an estate has been purchased subject to a mortgage, and the purchaser remains entirely passive, the land continues to be charged with the debt; but neither the executor nor heir of the purchaser is liable for the satisfaction of it. Such, however, is not the present case, for Sir *W.* and the Countess of *Bath* have not been wholly passive.

The first circumstance which presents itself, as evidence of their intention in relation to this debt, is the covenant of indemnity executed by Sir *W.* to *Williamson;* a circumstance, however, which is admitted not to be, of itself, sufficient to shift the burthen from the land, and such has been the determination in a variety of cases. (*Evelyn* v. *Evelyn,* 2 *P. Wms.* 591. *Tweddell* v. *Tweddell,* 2 *Bro. Ch. Cas.* 152.) All these cases, however, presume a voluntary purchase of property, supposed to be equal, and more than equal to the debt, and, in *England,* producing rents or income, more than adequate to the growing interest. In this instance, Sir *W.* was compelled to assume the payment of the debt, without any calculation that the land was an adequate fund for the purpose, in order to obtain the land; and it was natural for him and his agent to conclude that he was substituted in the place of *Williamson,* and was thenceforward to be regarded, not as a surety, but as the principle in the transaction. It is not asserted that an erroneous conclusion as to a legal point, is binding upon the party; but it is conceived, that where his situation is to depend upon his own intention, the way in which he himself must have viewed that situation, is irrefragable proof of his intention: such was the decision in *Pock-*

*ley* v. *Pockley,* which has been a leading case on the sub-ject. There, the testator, by his will, considered the debt as his own, and having so considered it, the law inferred that his personal estate was the proper fund for its dis-charge. That Sir *Wm.* did assume the mortgages men-tioned in the condition of the escrow, is apparent, from the large payments which were made by his agent, with-out compulsion, out of his personal estate, on account of those *debts.*

If this case stood alone upon the circumstances which took place in the lifetime of Sir *W.,* it will be found as strong as that of *Belvedere* v. *Rochfort,* (6 *Bro. P. C.* 520.) which though it may seem to have been shaken by subse-quent decisions, yet is in perfect harmony with *Parsons* v. *Freeman,* (*Amb.* 115. *S. C.* 2 *P. Wms.* 664. n.) where the deed of purchase contained a clause, "that the prin-cipal money, with the interest thereof, from a certain day, was to be paid and discharged by the purchaser, out of the consideration money in the deed expressed." Equi-valent, and more than equivalent to that clause, is Sir *Wm.'s* acceptance of the escrow, and, consequently, of the conditions on which the estate was to vest; and this must be deemed an express agreement to make the debt in ques-tion his own.

After the death of Sir *W.* Mr. *Troup,* who administrated on his personal property in this country, fully discharged two of the bonds and mortgages, and paid the interest ac-cruing on *Foster's* mortgage ; nor were any objections made on the part of the Countess, who allowed his accounts in which these payments were charged: Nay, more, in her correspondence with him, she refers to future payments to be made, "according to the arrangement with *William-son,*" and inquires, if he can furnish funds in *America,* to the amount, or how much must be drawn from *England:* and neither she, nor her agent, in their correspondence, intimates that the land would be resorted to as the source

from whence the debt was to be satisfied. Mr. *Troup*, too, engaged to Mrs. *Foster*, to discharge the debt in question out of the personal estate, as fast as it came to his hands, either in the course of his administration or of his agency for the Countess. He has, therefore, plainly assumed the debt on her behalf, and designated the very fund out of which it was to be paid. In consequence of this engagement, he obtained forbearance from the creditor; but the personal property here was insufficient to meet the demand; he, therefore, borrowed money from the bank, and drew bills upon the Countess, a measure which he was well authorized in taking, by the knowledge that he had of the intention of the Countess, and her father; though it is not pretended that it would alone be sufficient to change or affect the rights of the parties.

1817.

CUMBERLAND
v.
CODRINGTON.

Upon the whole they contended, that from the acts of Sir *W. P.* and the countess of *Bath*, it must be necessarily inferred, that they meant to make this mortgage a debt of their own. If so, the representatives of the real estate are entitled to the relief sought by the bill. (*Woods* v. *Huntingford*, 3 *Ves.* 130.)

*T. A. Emmet*, and *Wells*, contra. Had Sir *W. P.*, instead of acquiring an estate subject to a mortgage, himself been the original mortgagor, and died, as he did, intestate, it is not to be doubted but that, according to the law of *England*, his personal estate, that being the fund primarily liable for the payment of debts, would have been held to satisfy the mortgage in ease of the heir. Nor is it denied that such is the law of this state; it has been so long and so well settled in *England*, that it must be regarded as adopted by us, and ingrafted in our own jurisprudence. This, however, is obvious, that the rule is founded upon principles foreign from the nature and genius of our government. Its origin may readily be traced to that policy, which by giving the pre-eminence

to real property, seeks to cherish the landed aristocracy of the country : a policy, natural and proper under a system of government like that of *Great Britain*, but directly hostile to the spirit of our own. These considerations, though they will not, perhaps, authorize the Court to break through what has hitherto been considered the law both of this country and of *England*, cannot fail to manifest the impropriety of extending a rule, which owes its observance with us to the mere weight of authority, and not to the intrinsic principles of natural justice, or the peculiar nature of our political institutions. The Court will, therefore, not be disposed to extend its favour to the heir at law, any further than it will be compelled by decisions which it may deem obligatory.

As the mortgage in question was not originally executed by Sir *W.* to secure a debt of his own, the case does not fall within the rule referred to, which only applies to the debts of the ancestor himself, from whom both the funds are derived. The rule in *England*, applicable to cases like the present, is, that the personal estate of a stranger to an incumbrance on the property which he acquires subject to that incumbrance, is not liable for its exoneration, unless he has adopted the debt, and made it his own ; " the same," says Lord *Alvanley*, in *Woods* v. *Huntingford*, (3 *Ves.* 131.) " as if he was the original mortgagor." This adoption must be certain and unequivocal; for, as Lord *Alvanley* observes in the same case, the Court has been extremely " anxious not to make that inference, unless where it is perfectly clear and obvious." If so much caution be expressed in an *English* tribunal, where the doctrine of exoneration is avowedly founded on the principle, that " in questions between heir and executor, the heir and real estate are favoured ;" per Lord *Hardwicke*, in *Parsons* v. *Freeman*, (*Amb.* 115.) how much should that caution be increased, in the tribunals of a country, the

laws and political institutions of which, so far from che- 1817.
rishing this principle, are directly opposed to it.

In this cause, two questions present themselves : 1. Did CUMBERLAND
Sir *W. P.* make the mortgage debt in controversy his own CODRINGTON.
personal debt? 2. Was this done by the Countess of
*Bath* after his decease? Unless the one or the other of
them did it, the relief prayed for cannot be obtained. A
purchaser of a mortgaged estate may, undoubtedly, make
himself, or his personal funds, liable for payment ; but this
is a question of intention, and, according to the emphatic
language of Lord *Thurlow*, there ought to be " a demon-
stration of such intention." (*Billinghurst* v. *Walker*, 2
*Bro. Ch. Cas.* 608.) It may not be easy to deduce from
the variety of decisions on the subject, a fixed, invariable
criterion of intention ; yet it is suggested, with confidence,
that to constitute an adoption, the purchaser must render
himself responsible, at law, to the mortgagee, to pay the
debt ; or must expressly recognize it in his will, treating
it as his own, and directing its payment, in like manner
with his other debts. The covenant of indemnity execu-
ted by Sir *W.* on which, taken singly, the opposite coun-
sel do not seem much to rely, connected with auxiliary
circumstances, has been urged by them as proof of an
adoption : but their conclusions are not borne out by the
facts, and the facts show that the real property was con-
sidered by Sir *W.* and his daughter, as the primary fund
out of which payments were to be made, and that subse-
quent to the conveyance from *Williamson*, during all their
lifetime, whatever payments were made on account of the
mortgages, were made, it is true, out of the personal estate,
but that personal estate consisted of the avails of the
land.

The very form of the covenant of indemnity argues
strongly, that it was not the intention of Sir *W.* to make
the mortgage debts his own. Had he intended more, less
equivocal marks of his intention would have been exhibit-

1817.

CAMBERLAND
v.
CODRINGTON.

ed. Such a covenant does not amount to an assumption of the debt; the whole current of authorities shows, that even an express covenant with the vendor, by a person purchasing land subject to a mortgage, to pay off the incumbrance, is not effectual to charge his personalty; and there are many cases to prove, that even a covenant subsequently entered into with the mortgagee or his assignee, can have no higher efficacy. (*Evelyn* v. *Evelyn*, 2 *P. Wms.* 664. and note. *ibid.* *Billinghurst* v. *Walker*, 2 *Bro. Ch. Cas.* 604. *Tankerville* v. *Fawcet*, *Id.* 57. *Clinton v. Hooper*, 3 *Bro. Ch. Cas.* 211. *Butler* v. *Butler*, 5 *Vesey*, 534.) *Butler* v. *Butler* will be found to be a very strong case to this point.

The authorities are conclusive to show that neither payment of a part of the principal, or of the interest, is an adoption of the debt, notwithstanding a covenant to pay ; whereas here, there is only a covenant of indemnity. In *Perkyns* v. *Bayntun*, (2 *P. Wms.* 664. n.) there was a payment of part of the principal. In *Shafto* v. *Shafto*, (*Ibid.*) the interest was paid. In *Billinghurst* v. *Walker*, (2 *Bro. Ch. Cas.* 604.) a case precisely resembling the present, one debt was paid off, and the interest of the other. *Matthewson* v. *Hardwicke*, (2 *P. Wms.* 665. n.) is still stronger, for the devisee of lands charged with debts and legacies, paid them all off, except a legacy, for which he gave his note; yet Lord *Alvanley* held, that this only made the personal estate a collateral fund. So, again, in *Basset* v. *Percival*, (2 *P. Wms.* 664. n.) where the heirs gave a bond for the debt of the testator, Lord *Kenyon*, Master of the Rolls, determined that the real estate was the original debtor. Yet in the two last cases, the devisee in the one, and the heirs in the other, had made themselves personally responsible at law.

*Pockley* v. *Pockley*, (1 *Vern.* 36.) cited on the other side, is inapplicable to the present question, for there the testator, by will, expressly appointed the debt to be paid

out of his personal estate; and that was the ground of the decision. The owner of real estate subject to a mortgage, may satisfy it, either from his personal property, or out of the real estate itself, from the rents and profits, or by sales. Being the owner of both funds, he can, during his life time, apply which he pleases to the discharge of the debt, and has power to direct which should, after his death, be appropriated to that purpose. Had the testator, in his will, said nothing about the mortgage, it is clear that the heir must have taken the land *cum onere,* and that the personal estate could never have been applied to his relief. But he chose that the successor to his real property should have it free from the debt with which it was charged, and he, therefore, directed his executors to do, what he might himself have done, that is, to pay off the incumbrance from his personal estate. In *Parsons* v. *Freeman,* (*Ambl.* 115.) referred to by the opposite counsel, although it is very open to criticism, yet Lord *Hardwicke* places his decision on the ground that the purchaser had covenanted to pay the mortgage; he had not merely covenanted to indemnify ; it is, therefore, not analogous ; besides, it will not be easy to reconcile it with prior and subsequent cases, in all of which, and some of them too were decisions of Lord *Hardwicke* himself, although a covenant had been given to pay off the incumbrance, it was yet held that the land was the primary fund, and that the purchaser had not made the debt his own. (*Evelyn* v. *Evelyn,* 2 *P. Wms.* 659. *Leman* v. *Newnham,* 1 *Vesey,* 51. *Lacam* v. *Mertins,* *Id.* 312. *Lewis* v. *Nangle,* *Ambl.* 150. *S. C.* 2 *P. Wms.* 664. n. *Forrester* v. *Leigh,* *Ambl.* 175. *S. C.* 2 *P. Wms.* 664. n. *Ancaster* v. *Mayer,* 1 *Bro. Ch. Cas.* 454. *Shafto* v. *Shafto.* *Basset* v. *Percival.* *Matthewson* v. *Hardwicke,* 2 *P. Wms.* 664. n. *Billinghurst* v. *Walker,* 2 *Bro. Ch. Cas.* 604. *Butler* v. *Butler,* 5 *Vesey,* 534. *Tweddell* v. *Tweddell,* 2 *Bro. Ch. Cas.* 101.)

The case of *Belvedere* v. *Rochfort,* (6 *Bro. P. C.* 520.

*1817.*

CUMBERLAND
v.
CODRINGTON.

2d. ed. by *Tomlins*, vol. 5. p. 299.) so far from milita-- ting against the principles contended for on the part of the defendants, assumes them throughout as settled law and proceeds on the ground that a legal liability to pay the mortgage debt had been created by the purchaser; it is in the application of those principles that its correctness may be questioned. But that case, were it uncontradicted by later decisions, ought rather to be regarded as standing on its own particular circumstances, than as forming a general rule. It presented an instance of persevering oppression and injustice, at which our feelings revolt, and was peculiarly calculated to awaken in the minds of those who determined it, sympathies too powerful to be repressed, by a cold and rigid rule of law, had such stood in the way. One can scarcely imagine a case abounding with stronger temptations to pass the limits of strict judicial right, in order to attain substantial justice. When a case precisely similar again occurs, which it is to be hoped, for the honour of our nature, never will, then it may be resorted to as a precedent. It is sufficient, for the present purpose, to say, that if there be any thing in that decision hostile to the arguments advanced for the plaintiffs, it was expressly overruled by Lord *Thurlow*, in *Tweddell* v. *Tweddell*, which has ever since been considered, in *England*, the standard authority on the subject, and is uniformly recognized, as such, by all the subsequent decisions. (*Billinghurst* v. *Walker*, 2 *Bro. Ch. Cas.* 604. *Woods* v. *Huntingford*, 3 *Vesey*, 128. *Butler* v. *Butler*, 5 *Vesey*, 534.)

If there were no act on the part of Sir *W.* which amounted to an adoption of the debt, still less has the Countess indicated that intention. The proceedings of Mr. *Troup* in paying off the debts from the money arising from sales of the land, were, no doubt, approved of by her, for such had been the course sanctioned by her father, and which she had intimated her design to pursue. This was no evidence of a determination to resort to her

personal fund, for the discharge of the mortgage. She had succeeded alike to her father's real and personal property, and might appropriate which she pleased to the purpose. As to the payments which have been made, they cannot be recalled, and so far the heir is entitled to the benefit of them, but they confer no right to call for a continuance of them, or an extinguishment of the balance out of the personal estate. This point is established by the cases already referred to. The correspondence between the Countess and her agent, certainly denotes no intention to assume any liability, or if it can be so construed, it was founded on a misapprehension of Sir *W.'s* engagement, and having never been carried into effect, can in no way vary the rights of the present parties.

The engagement by Mr. *Troup* to Mrs. *Foster*, to pay the principal and interest of the bond and mortgage which she held, out of the proceeds of the *Pulteney* estates, as fast as they should come to his hands, on condition of forbearance to prosecute, has been adduced as evidence of adoption. If this agreement were, in other respects, valid, still it is too vague and uncertain to be operative. It neither appears, how, or for what time, Mrs. *Foster* was to forbear to prosecute. But the engagement is substantially bad. There is no evidence that Mr. *Troup* had authority to render the Countess personally liable. He had no power as agent; and as administrator, he could not subject the personal estate in his hands, to the payment of a debt for which the intestate had never made himself personally responsible. Unless this was originally the debt of Sir *W.*, no engagement by Mr. *Troup*, as his administrator, could have any effect; and that it was not his debt has already been shown. Supposing Mr. *Troup* to have had authority to make the engagement, as agent for the Countess, it was then a promise that she should pay the debt of another, for which a certain real estate was pledged as collateral security. To make it obligatory on the princi-

1817.

CUMBERLAND
v.
CODRINGTON.

pal, a precise and specific agreement in writing became necessary, which should distinctly express the terms of the contract, and the consideration on which it was founded. (*Wain* v. *Walters*, 5 *East's Rep.* 10. *Sears* v. *Brink*, 3 *Johns. Rep.* 214.) Besides, no contract, however formal, founded upon forbearance to prosecute, could be binding on the Countess, unless as the heiress of Sir *W.* she had been liable for the payment of the debt, at law. To make the promise of an heir good, in consideration of forbearance, the heir must be liable at law to pay the debt. (*Barber* v. *Fox*, 2 *Saund.* 136.) Hence, whether Mr. *Troup* be regarded as agent or administrator, he had no power to make the contract; or if he had, that power has not been legally executed.

In respect of the money borrowed, and the bills drawn by Mr. *Troup*, those offered no indication of an intention in the Countess to charge herself with the debt. The right to make the loan is not now in controversy; and although the drawing the bill might well be justified by the high confidence deservedly reposed in Mr. *Troup*, by his principal, yet it was, strictly and legally, an unauthorized act, as is evident from his own letters to the Countess and her agent in *England*; and the cautious and guarded manner in which he proceeded, instead of selling the bill, and at once receiving the amount, shows that he himself viewed it in no other light than as an experiment. The act of an agent wholly unauthorized, like this, can impose no responsibility on the principal.

There is one general answer which may be given to the various acts, whether taken individually or collectively, that have been urged as proofs of adoption, and which, if the principle contended for, on the part of the defendants, be correct, is decisive of the question. It is this, that those acts do not constitute an adoption of the mortgage debt, either by Sir *W.* or the Countess, because they gave no right of action at law against either; and because Sir *W.*,

who died intestate, could not, by will, have recognized and directed the payment of it; and this could not have been done by the Countess, whose will, executed before the death of her father, is necessarily silent on the sub- ject. To constitute an adoption, there must have been a direct liability at law to pay the debt to the mortgagee or the holder of the mortgage. This principle is distinct- ly laid down by Lord *Thurlow*, in *Tweddell* v. *Tweddell*, and was the foundation of his decision. "It is a clear rule," says he, "that the personal estate is never charged in equity, when it is not at law; and if not chargeable at law, there is no principle or case in this court to warrant its being chargeable in equity, contrary to the order of the law." It is this legal liability that alone gives a court of equity the right of marshalling assets. "The rule of marshalling assets," says his lordship, in the same case, "is, that it must be a debt affecting both the real and personal estate." If the personal estate were not liable at law, how can a court of equity throw a charge upon it? Whence is such a power derived? Unless there was a liability at law, the the debt is clearly not the debt of the person owing the es- tate, but of another: and the statute of frauds declares that no man shall be answerable for the debt of another, unless by an agreement or note in writing, and duly signed. How then can a court of equity, where no fraud is pre- tended, burden one man with the debt of another, when he has contracted no legal obligation, executed no agree- ment, note, or memorandum in writing, in defiance of the statute—upon uncertain, vague, and equivocal acts, ob- noxious to misconstruction and misrepresentation, and precisely those which the statute was designed to invali- date? The rule contended for is a safe and salutary one; it tends to that certainty which is the great object of law, and affords a definite guide to ascertain the intention of a party. Many of the cases cited show that even a legal lia- bility to pay the debt of another, will not, of itself, make it

the party's own, and subject his personal estate to the pay-ment of it, in the first instance, unless it was coupled with an intention, that such should be the consequence: yet it is evident, that if that intention cannot exist without the liability, there is, at least, one ingredient which be-comes indispensable to form an adoption; and thus we ob-tain a standard to ascertain the intention, which otherwise would be left in utter uncertainty, and dependant on no one fixed or settled principle whatever. The necessity of a legal liability is, in pursuance of the doctrine in *Twed-dell* v. *Tweddell*, recognized in the subsequent cases. (*Woods* v. *Huntingford*, 3 *Ves.* 127. *Butler* v. *Butler*, 5 *Ves.* 539. *Waring* v. *Ward*, 7 *Ves.* 332. *The Earl of Oxford* v. *Lord Rodney*, 14 *Ves.* 417.)

*Harison*, and *Hoffman*, in reply. The counsel for the defendants, admitting the rule of law, both in *England* and this country, to be, that the personal estate is the pri-mary fund for payment of debts, yet by attributing that rule to a disposition to cherish a landed aristocracy, and by hold-ing it up as inconsistent with the intrinsic principles of natu-ral justice and the spirit of our political institutions, have endeavoured to induce the court to view the principle with a jealous eye, and to extend it no farther than it might feel itself bound by decisions which it considered as obliga-tory. In reply to these observations it may be answered, that the principle does not owe its origin to the cause as-signed, for it applies to land in *gavelkind*, as well as to other species of real property. It formed part of the law of *England*, on the 19th of *April*, 1775, and consequently remained a part of the law of this state. It has been well settled, by a series of decisions in *England*; and the deci-sions of the *English* courts, until the period of our revolu-tion, upon every part of the law applicable to our situation, became as binding upon us, as upon those courts them-

selves. But their subsequent decisions are not, intrinsically, of any binding authority. If they are wholly independent of, or vary from anterior decisions ; if founded upon statutes which we do not acknowledge, or which differ from our own, they are not entitled to the slightest consideration. Our courts are not to follow them through all their turns and windings, but must adhere to the legal maxims in existence, when our revolution took place ; and the only use that can properly be made of late adjudications, is to admit and follow them, when they are the deductions of right reason from pre-established principles.

Had the mortgage in question been originally the debt of Sir W. or the Countess of *Bath*, it follows, of course, that the court would direct it to be paid out of their personal estate : but it is distinctly admitted, that it was not originally the debt of either of them, and that in consequence of certain artificial reasoning, so subtle as almost to escape the notice of the understanding, a distinction has prevailed between a debt of that description and one which the party himself created. That the heir or devisee of real estate charged with a debt of the former kind, may have the aid of the personal property for his exoneration, it is necessary that what was not the child of the party by nature, and at its birth, should become so by adoption. In other words, he should manifest an intention to make the debt his own ; and such is the language of Lord *Thurlow*, in 2 *Bro. Ch. Cas.* 608. The counsel for the defendants do not, indeed, openly deny this doctrine ; but then they contend for some invariable criterion of intention, and have taken upon themselves to fix that criterion. Had a rule existed like that which they lay down, it is truly extraordinary that those very accurate writers, *Fonblanque* and *Coxe*, should not have known it. They say, that the purchaser should appear to have intended to make the debt his own, and they mention certain circumstances as not alone sufficient to manifest such intention, but they

no where assert that the infalliable criterion of intention was to be sought only in the circumstances to which the counsel for the defendants have referred.

Why should those circumstances exclude all other evidence of intention? But unless they do, the rule contended for on the opposite side must be too narrow, and is too weak a foundation to support the structure that has been raised upon it. Let us suppose that the purchaser, having a sum of money in the hands of his steward, should give him a precise order to discharge the mortgage with it; can it be doubted that if the purchaser were to die suddenly after giving the order, this would be a sufficient demonstration of his intention to make the debt his own, and to pay it out of the personal estate? Yet the creditor might be no party to the order, and consequently have acquired no other right of action than what he previously possessed, that is, the right of suing by action of ejectment, or by bill in equity. Again; let us suppose that the purchaser should execute a deed to a younger son, or to a collateral relation, reciting that he had made the purchase subject to a mortgage, which, nevertheless, he considered as his own debt, and meant to discharge it out of his personal estate; can there be a doubt of this being a sufficient demonstration to adopt the debt, although there was no covenant with the creditor to pay the money, or with the grantee to disencumber the property? Certainly, these acts would be far more clear and decisive than any thing in *Parsons* v. *Freeman*, or Lord *Belvedere* v. *Rochfort ;* yet they are acts falling within neither branch of the rule proposed by the opposite counsel.

So far from recognizing the doctrine of an invariable test, the Master of the Rolls, in *Woods* v. *Huntingford*, (3 *Ves.* 132.) speaking on this subject, says, " it is very unpleasant for a judge, where an inference is to be drawn from equivocal acts, and the facts upon which the decision turns are distinguished by such nice lines." And after

1817.

CUMBERLAND
v.
CODRINGTON.

mentioning some of the particular circumstances of the case, he adds, "I cannot collect that Lord *Thurlow* said, a man cannot make a debt his own without an express declaration." Hence it appears, that if there be no express declaration, the intention to adopt may be inferred, if a fair examination of circumstances will justify the inference.

It is true, that a mere covenant or bond of indemnity, executed by the purchaser to the original mortgagor, has been held, whimsically enough, not to be, in itself, a sufficient indication of intention to adopt the debt; *whimsically*, because in reality where the purchaser executes such an instrument, he makes his personal estate, though circuitously, yet in every court, liable for the debt. It is not necessary that the real estate should be at all resorted to. A recovery being had against the original debtor, he can immediately recover over from the purchaser, who must pay the amount, without reference to the value of the mortgaged premises. If, then, this were a new point it would be most consonant to reason, to hold that a bond or covenant of indemnity was itself an adoption; and though from the weight of authorities, this circumstance cannot alone be relied upon as evidence of intention, yet it may well be used to fortify others of greater importance; and Lord *Alvanley* in *Butler* v. *Butler*, (5 *Ves.* 538.) intimates, that " if it was a new case, and he was called upon to decide the point, for the first time, he might have been of another opinion." The facts in the present case, although some of them, singly, may possess little weight, yet when taken collectively, they are sufficient to carry conviction. *Juncta valent.* Thus Lord *Cowper*, in *Flowyer* v. *Livingston*, (1 *P. Wms.* 272.) observes, " that where several circumstances concurred, which, though each of them singly might not be of force to bar the redemption, yet all of them jointly together were strong enough to prevail over it."

1817.

CUMBERLAND
v.
CODRINGTON.

As to the several cases anterior to our revolution, relating to this subject, none of them affect or over-rule the decision of Lord *Hardwicke* in *Parsons* v. *Freeman*, which has been so much criticised by the opposite counsel, and which if it he law, it is hardly possible to say, that even upon the original agreement, Sir *W. P.'s* personal estate did not become the primary fund for the payment of this debt; that case shows, too, that Lord *Hardwicke* considered neither a liability at law, nor a declaration by will, as essential to the demonstration of the purchaser's intention. As to the decisions subsequent to the year 1775, it is sufficient to say, that if they vary from the law as previously established, they are of no authority. *Belvedere* v. *Rochfort*, was a decision before our revolution, made in the last resort, by the highest tribunal in the *British* empire, and must be regarded as law in this country. It is true that Lord *Thurlow* has expressed a dissatisfaction with it, and has endeavoured, as far as he could, to overrule it. But it is difficult to perceive how his lordship, sitting as judge in an inferior tribunal, could overrule the decision of a superior court. The case before the court contains at least as strong, if not stronger circumstances, demonstrating the intention to adopt the debt, than any in that case.

It is a known rule, which has a bearing upon the question, that where the real estate has once sustained the charge, it is not to be a second time burthened. (1 *Salk.* 153. 1 *P. Wms.* 518.) The real estate in this case has borne the charge; for it is from the proceeds of it that payments have been made. All the reasoning of the opposite counsel, founded upon the statute of frauds, is inapplicable and fallacious. It may have been introduced *ad captandum*, but cannot seriously be relied upon.

*December* 31.

The cause having stood over for consideration, the following opinion was, this day delivered by the Court .

THE CHANCELLOR. The question in this case, between the heir at law and the personal representatives of the Countess of *Bath*, is, which of them shall pay a certain mortgage debt.

*Charles Williamson*, in 1801, had in himself the legal title to the part then remaining unsold of what is called in the case the " *Genesee* tract," and he held it as a trustee for Sir *William Pulteney*. It had become expedient that Sir *W. P.* should be invested with the legal title, but *Williamson* refused to convey, except upon certain terms. The terms were, that Sir *W. P.* should pay him a large sum of money, as a remuneration of his services as agent, and should assume the payment of certain debts against *Williamson*, and the mortgage debt in question was one of them. This debt arose on the purchase of lands lying west of the *Genesee* river, from *Andrew Craigie*, in 1796, and the bond and mortgage were given by *Williamson* to *Craigie*, to secure part of the purchase money. The equity of redemption which *Williamson* had in the mortgaged lands, was conveyed along with the other lands to Sir *W. P.*, who had complied with the terms of settlement proposed by *Williamson, by the execution of two certain indentures.* Those indentures specify precisely the manner in which the mortgage debt was assumed, and we have no evidence of any other agreement.

By one of the indentures, Sir *W. P.* covenanted with *W.* to indemnify, and save him and his heirs, executors, &c. harmless from all suits and demands, by reason of the bond and mortgage. After this settlement Mr. *Troup* succeeded as agent for Sir *W. P.* in respect to his *American* estates, and with competent powers to manage them, and in the lifetime of Sir *W. P.*, the agent paid a large arrearage of interest on the bond and mortgage, and no objection was made to the payment.

Sir *W. P.* died intestate; and the first and leading point in the case is, whether Sir *W.*, by any, or all of the above

CUMBERLAND
v.
CODRINGTON.

facts and circumstances, made the mortgage debt his own, so far as to render his personal estate, in the hands of his personal representative, chargeable, as the primary fund to be applied to the payment of that debt, in exoneration of the land.

*As between the representatives of the real and personal estate, the land is the primary fund to pay off a mortgage.*

The rule appears to be, that, as between the representatives of the real and personal estates of Sir *W. P.,* the land is the primary fund, and is to be first applied ; and the personal estate is only to be resorted to as auxiliary.

I think it can be easily shown, that this is now the settled *English* rule of equity upon such a state of facts.

In *Shafto* v. *Shafto,* (note 1 to 2. *P. Wms.* 664.) which was decided by Lord *Thurlow,* in 1786, the devisee of land subject to a mortgage executed by the testator, *covenanted with the owner of the mortgage,* that the estate should remain a security for the debt and interest, with an additional one per cent. of interest. The question was, whether the personal estate of the devisee, who had died in the mean time, should not pay the debt and interest, or, at least, the arrears of interest, with the additional one per cent. But the Lord Chancellor was clearly of opinion, that the personal estate ought not to discharge the mortgage, for the land was the primary fund, and that the interest must follow the nature of the principal, and that the contract for the additional interest was, also, in the nature of a real charge.

Lord *Kenyon,* as Master of the Rolls, laid down the same rule, about the same time, in the case of *Tankerville* v. *Fawcet.* (2 *Bro.* 57.) He there declared, that " where an estate descends, or comes to one, subject to a mortgage, although the mortgage be afterwards assigned, and the party enters into *à covenant to pay the money borrowed,* yet that shall not bind his personal estate." In that case, the devisee of land having, voluntarily, and very honourably, *charged a simple contract debt of the testator upon the land devised,* and died, the question was, whether his personal

estate should exonerate his real, of this debt? It was held not to be the proper debt of the devisee, and that his personal estate was not to be charged.

Both these cases contain much stronger acts of the substituted debtor than the one before me. But in *Tweddell* v. *Tweddell*, (2 *Bro.* 101. 152.) Lord *Thurlow* examined the subject more at large, discussed the point with his customary boldness and sagacity, and declared the rule of equity with a certainty and precision which have rendered his decisions a leading authority in all the subsequent cases.

In that case, *A.* purchased the equity of redemption, in an estate under mortgage, and agreed with the mortgagor to pay, as part of the consideration for the purchase, the mortgage debt, to the son and heir of the mortgagee, and the residue of the consideration money to the mortgagor. He also *covenanted with the mortgagor*, that he would pay the mortgage debt to the heir of the mortgagee, and would indemnify the mortgagor and his representatives from the mortgage.

On a bill by the devisee of *A.* to have his personal estate applied in discharge of the mortgage, it was urged upon the argument, that where the real estate was, from the nature of the contract, primarily liable, it should be first applied; and that though covenants are added, yet, if they are meant as collateral securities to the land, they could not have the effect of altering the fund. The Chancellor held, in that case, that the personal estate of *A.* was not bound to exonerate the real; and he said it was a clear rule that the personal estate is never charged in equity, where it is not at law; that there was no principle, or case, in that court, to warrant its being chargeable in equity contrary to the order of the law; that the grounds upon which former cases had been decided, applied to that case; that the rule of marshalling assets was, that it must be a debt affecting both the real and personal estate; that

1817.

CUMBERLAND
v.
CODRINGTON.

1817.

CUMBERLAND
v.
CODRINGTON.

in that case, the personal estate never was liable by an action against the party, and so he thought as to the case of *Rochford* v. *Belvedere*, though the House of Lords had held the personal estate liable; that the buyer here took the land subject to the charge, but the debt, as to him, was a real, not a personal debt; that his contract with the mortgagor was only that the debt should not fall upon him, and it was a mere contract of indemnity, and he would have been bound, without any specific contract to indemnify him.

This case is very much in point; and if the rule of equity be correctly stated, it puts an end to the present discussion. It is indeed a much stronger case than the present, for here is no stipulation with the seller to pay to the owner of the mortgage the mortgage debt, as being part of the consideration money; and here is no express covenant to pay the mortgage debt. Here is only a naked and dry covenant of indemnity.

If I was to question the case of *Tweddell* v. *Tweddell*, it would not be from any presumed error in the principle, but from a doubt of its application. When the indentures between the mortgagor and purchaser recited an agreement, by which *A.* had agreed to pay out of the purchase money, to the son and heir of the mortgagee, the principal and interest due on the mortgage, being 2,155 pounds, and the residue of the purchase money, being 1,345 pounds, to the mortgagor, it might be a question whether the son and heir could not have sued at law for that money, as so much received for his use. It has been held, that if one person makes a promise to another, for the benefit of a third person, that third person may maintain an action at law on that promise. (*Dutton and wife* v. *Pool,* 2 *Lev.* 210. 1 *Vent.* 318. *T. Jones,* 103. *Starkey* v. *Mill, Styles,* 296. *Martin* v. *Hind, Cowp.* 437. *Marchington* v. *Vernon,* 1 *B & Pull.* 101. note. Lord *Alvanley, in 3 B. & Pull.* 149, and note, *ib. Schermerhorne* v. *Vanderheyden,* 1 *Johns.*

*If one person makes a promise to another, for the benefit of a third, that third person may maintain an action at law on the promise.*

*Rep.* 140.) But the great value of this case consists in the principle it has so fully and explicitly declared. As Lord *Kenyon* observed in another cause, "The use of cases is to establish principles ; and if the cases decide different from the principles, I must follow the principles, not the decisions."

In the next decision of Lord *Thurlow*, which followed some time after, (*Billinghurst* v. *Walker*, 2 *Bro.* 604.) he pushed his doctrine to the utmost length. The Rectory of *F.* was held by a lease for lives, subject to a charge of 2,200 pounds to *Martha Vernon.* It was conveyed, by the owner of the lease, to *George Woodroffe*, subject to the same charge, and to a charge of 900 pounds to one *Pery ;* and in the indenture by which it was conveyed, (and to which *Martha Vernon* was a party,) he covenanted to pay the charge to *Martha Vernon*, as well as the other charge. He discharged the debt to *Pery*, and, afterwards, gave a bond to *Martha Vernon* to pay the interest of the 2,200 pounds during her life, and the principal at his death. After repeated renewals of the lease, *G. W.* died, having devised the Rectory to two of the defendants, and appointed two others of the defendants his executors. The charge being called in and paid to a legatee of *Martha Vernon*, by the executors of *G. W.*, the defendants were called on by the plaintiffs, as pecuniary legatees of *G. W.*, who were unpaid, to have the 2,200 pounds replaced by the devisees of the Rectory, and paid over to them. But the defendants insisted that, in consequence of all these transactions, this charge had become the personal debt of *G. W.*

This was a very strong case in favour of the doctrine set up, in that instance, by the defendants. There was not only a covenant by *G. W.*, the purchaser of the lease, subject to the debt, to pay the debt, and a covenant in the same instrument to which the creditor, or owner of the

charge was a party; but there was, afterwards, a bond given to her, altering and extending the original time of payment. This would seem to have amounted to that "demonstration of the intention" requisite to make the debt a personal obligation. But it was held, that giving the bond was not sufficient; that it was merely a collateral security, which did not vary the nature of the charge, which continued primarily a debt upon the estate; and the defendants were, consequently, decreed to pay over the money. It was admitted that *G. W.* made himself personally liable to the creditor, but still it did not throw the charge on his personal estate, because there was not a demonstration of such intention. So that it seems not to be sufficient that the stranger, who takes the estate subject to a debt, should become legally responsible to the creditor, unless that responsibility be accompanied with evidence of an *intention* to assume the debt, as a personal debt of his own, and detached, as it were, from the land.

The case of *Mattheson* v. *Hardwicke*, (note to 2 *P. Wms.* 664.) was decided about the same time with the one I have just considered, by Lord *Kenyon*, as Master of the Rolls. The testator there, devised an estate to *A.* and *B.* in fee, charged with the payment of debts and legacies. *A.* paid all the debts and legacies, except one legacy of 100 pounds, for which he gave his note to the legatee, and died. It was admitted that he had paid off the other incumbrances, with a view of easing the estate from them altogether, but the note there was held to be merely a collateral security, and that the devised estate was the primary fund for the payment of it.

The question in these latter cases seems to be, not merely whether the purchaser has rendered himself liable at law to a suit by the creditor, but which estate is to be deemed the primary fund, and which only the auxiliary,

when a man gives a bond and mortgage for a debt of his own contracting, the mortgage is understood to be merely a collateral security for the personal obligation. But when a man purchases, or has devised to him, land with an incumbrance on it, he becomes a debtor only in respect to the land; and if he promises to pay it, it is a promise rather on account of the land, which continues, notwithstanding, in many cases to be the primary fund. The same equity which in other cases makes the personal estate contribute to ease the land, as between the real and personal representatives, will here make the land relieve the personal estates. There is good sense and justice in the principle; and I feel the force of the doctrine, that it requires very strong, and decided proof of intention, before the court can undertake to shift the natural course and order of obligation between the two estates. We have already witnessed the tenacity with which the court adheres to the natural order of the funds, when a stranger comes in and takes the incumbered land; and the books are full of cases, on the other hand, which subject the personal estates primarily, and as "the natural fund," to the payment of debts originally contracted by the party, and even though the debt should be created by mortgage, without either bond or covenant. (1 *P. Wms.* 291. *Prec.* in *Ch.* 7. 61. 3 *P. Wms.* 358. 1 *Vesey,* 251. 2 *Atk.* 430. 1 *Bro.* 454.)

I proceed to the case of *Woods* v. *Huntingford,* (3 *Vesey,* 128.) in which Lord *Alvanley* brings the subject into discussion.

*R. H.* had mortgaged land to raise money for the use of his son *John.* The land was afterwards conveyed, subject to the mortgage, to the use of *John,* who joined with his father in a covenant for the payment of the money. The land was next reconveyed to *R. H.,* who covenanted to discharge the mortgage, and afterwards borrowed a further sum from the mortgagee, *and made a new mortgage for the entire debt.* The question was between the heir

1817.

CUMBERLAND
v.
CODRINGTON.

Where a man gives a bond and mortgage for his own debt, the mortgage is merely a collateral security. But if a purchaser or devisee of land incumbered, renders himself personally liable to the creditor for payment, the land, as far as relates to the marshalling of assets, is the primary fund for payment. Unless a contrary intent be clearly shown.

1817.

CUMBERLAND
v.
CODRINGTON.

and personal representatives of *R. H.*, which estate should bear the debt.

It is difficult to perceive a point in the case; and the Master of the Rolls was clearly of opinion, that *R. H.* had made the debt his own, though it was primarily the debt of his son in equity, and of himself and his son at law. He poperly adds, that if these facts were not sufficient to make the debt his own, a man never could make a debt his own, without express declaration. He was very careful not to contradict, in any degree, the principle established in *Tweddell* v. *Tweddell*, which was a very governing case. In that case, there was no communication with the mortgagee, but only a covenant of indemnity, and he did not by that act take the debt upon himself personally.

In *Butler* v. *Butler*, (5 *Vesey* 534.) the case of *Tweddell* v. *Tweddell* is again recognized and followed by the Master of the Rolls. This was the purchase of an equity of redemption, and an agreement with the vendor to pay the mortgage debt of 2,000*l.*, and, also, 1,000*l.* to the vendor; but here, likewise, there was no communication with the mortgagee. It was admitted, that *Tweddell* v. *Tweddell* was in point, and that the mortgage debt remained primarily chargeable upon the real estate. It was not the proper debt of *Butler*, the purchaser, and he could not have been personally sued by the mortgagee. Lord *Alvanley* collected from the decisions, that if a man purchases an estate subject to a charge, and does no more than covenant with the vendor that he shall be indemnified, it is not his debt, *except in respect to the estate ;* and the estate, and not his personal property, must bear it. He admitted that the purchaser might have been liable circuitously to the vendor for his indemnity, but he said the decreee would have been then for sale of the estate.

The case of *Waring* v. *Ward*, (5 *Vesey*, 670. 7 *Vesey*, 332.) is still more interesting; for it gives the opinion of Lord *Eldon* on this much litigated question.

In that case, the testator had purchased an estate subject to a mortgage. He borrowed the sum of 20,000*l.* and gave a new bond and mortgage for it, and thus made a new and different contract with the mortgagee. The heir was decreed to be exonerated by the personal assets of the testator from the payment of that sum, because the real contract was only secondary, and the personal was the primary contract. Nothing can be clearer than the conclusion in this case; but Lord *Eldon* gave his view of the general doctrine.

He observed, that the rules on the subject were extremely clear, and that the principle upon which the personal estate was first liable in general cases was, that the contract was *primarily* a personal contract, and the land bound only *in aid* of the personal obligation to fulfil the personal contract. That upon the transfer of a mortgage, not originally the personal debt of the party, by adding his personal contract he will not make his personal estate liable, in the first instance. That Lord *Thurlow* carried the doctrine to this extent, viz. That if the purchaser of the equity of redemption covenants to pay the mortgage debt, and also to raise the interest from four to five per cent.; yet, as between the real and personal representatives of the purchaser, the additional interest was not even primarily a charge upon the personal estate, for it was incident to the charge. That, even independent of a covenant of indemnity, the purchaser of an equity of redemption is bound to indemnify the vendor against any personal obligation, to pay a debt charged on an estate of which he had become the owner. That the case of *Tweddell* v. *Tweddell,* went upon the principle, that the debt due to the mortgagee, was never a debt *directly* from that person whose personal assets were sought. That, if Lord *Thurlow* was right upon the fact, the case was a clear authority that the purchase of an equity of redemption will not make the mortgage debt the debt of the purchaser. That in

his hands it is *the debt of the estate*, and a mortgage interest, as between his representatives.

In the case of *The Earl of Oxford* v. *Lady Rodney*, (14 *Vesey*, 417.) the testator purchased an estate subject to a mortgage, and paid the consideration remaining for the vendor beyond the mortgage, to the vendor, and then covenanted directly with the mortgagee to pay him the mortgage debt. The question arose between his heir at law and personal representatives; and Sir *Wm. Grant*, the Master of the Rolls, took occasion to observe, that it was not very easy to reconcile *Tweddell* v. *Tweddell* with the principle established by Lord *Hardwicke* in *Parsons* v. *Freeman*, viz. that where the mortgage money was taken as part of the price, the charge becomes a debt from the purchaser. But he admits that Lord *Thurlow's* principle was right, if the real result of the facts in that case was, that the contract of the purchaser never gave any *direct and immediate* right against himself to the mortgagee, and was only a contract of indemnity to the vendor against the mortgage. This case differed materially from that of *Tweddell* v. *Tweddell*, for there was a direct contract with the mortgagee, and in that case there was no dealing with the mortgagee.

Though Sir *Wm. Grant* declares, that *Tweddell* v. *Tweddell* is now to be looked upon as an authority to the extent to which it goes, yet he seems to intimate that an inconsistency existed between that decision, and what Lord *Thurlow* said in *Billinghurst* v. *Walker*, " that if the charge was part of the price, then the personal estate was liable." I cannot understand this observation of Lord *Thurlow*, nor see the importance of the criticism. The mortgage debt is always part of the price, unless there be an agreement that the vendor should take up the incumbrance. The purchaser, wherever he covenants to indemnify the vendor, takes the land *cum onere*; this is the clear understanding of the parties, and the value of the incumbrance will, of course,

be deducted from the real value of the land. In *Tweddell* v. *Tweddell*, the charge was part of the price, and *that part* of the price the purchaser was to pay to the mortgagee. This was the case, also, in *Butler* v. *Butler*, yet Lord *Alvanley* takes no notice of that distinction. In the very case of *Billinghurst* v. *Walker*, the charge was, in one sense, part of the price, for the land was conveyed to the testator as a marriage portion for his wife, after deducting the incumbrances which the testator was to pay. All sales of equities of redemption, where there is no express agreement to the contrary, pass the estate with the incumbrance; and the purchaser will always withhold the amount of the incumbrance from what is deemed the value of the land, and he pays only *the residue* to the vendor. The only question in all these cases is, whether a right of action at law does not accrue to the mortgagee, when the amount of the mortgage debt is distinctly marked and separated from the price to be paid to the vendor, and by agreement between vendor and vendee, is left in the hands of the latter for the use of the mortgagee. It was held in *Nelson* v. *Blight*, (1 *Johns. Cas.* 205.) that where a trust was created for the benefit of a third person, though without his knowledge at the time, he may affirm the trust, and enforce its execution; and if it be to pay money, he may enforce its execution at law. This doctrine was again affirmed in *Weston* v. *Barker*; (12 *Johns. Rep.* 276.) and I think the same principle is to be met with in 7 *Cranch*, 71.

This series of cases, which I have thus examined, shows very conclusively, that by the *English* equity system, as it has been declared received for the last thirty or forty years, the purchase of the equity of redemption, in this case, by Sir *W. P.* with a covenant of indemnity to *Williamson*, the mortgagor, against the mortgage debt, did not make the debt his own, so as to render his personal assets the primary fund to pay it. The cases all agree

1817.

CUMBERLAND
v.
CODRINGTON.

Where a trust is created for a third person though without his knowledge, he may afterwards affirm it, and enforce the execution of it.

that no covenant with the mortgagor is sufficient for that purpose. There must be a direct communication and contract with the mortgagee; *and even that is not enough,* unless the dealing with the mortgagee be of such a nature as to afford decided evidence of an *intention* to shift the primary obligation from the real and personal fund. The cases of *Tweddell* v. *Tweddell,* and *Butler* v. *Butler,* contained covenants with the mortgagor to pay the incumbrance, and that was not sufficient. The cases of *Shafto* v. *Shafto, Bullinghurst* v. *Walker,* and *Mattheson* v. *Hardwicke,* contained a communication and contract with the mortgagee, to pay the debt, and even that was not sufficient. In *Tankerville* v. *Fawcet,* the devisee voluntarily assumed a simple contract debt, and charged it on his land, and that was not sufficient. It required such a special dealing as in *Woods* v. *Huntingford,* and *Waring* v. *Ward,* and *Oxford* v. *Rodney,* by which the original contract seems to have been essentially changed, and lost or merged in the new and distinct engagement with the mortgagee. It was clear from the *res gestæ* in these latter cases, that the party taking the incumbered estate meant to take upon himself the debt, absolutely, and at all events, *as a personal debt of his own.* So far from being liable to difficulty, it appears that the decision in *Tweddell* v. *Tweddell,* did not go so far as other cases had done, and it is only peculiar in laying down as a test, whether there was or was not a direct personal dealing and contract with the mortgagee, by which the debt was assumed.

But we are told that no *English* authorities since 1775 are of binding authority, and that our courts are not to vary with the opinions, or perhaps caprice, of *English* tribunals. It is true, that we are not to be bound by their errors, nor do we feel subdued by their authority, but we can listen with instruction to their illustration and application of the principles of the science. "Far from me and from my friends, be such frigid philosophy," or, such unreasonable

pride, as may turn us with indifference or disdain from the decisions and the wisdom of other nations. It is to be recollected, that we have very little domestic precedent in matters of equity to guide us. A question of this kind has, probably, never before arisen in our own courts. We *must* resort for information to the courts of that nation from which our jurisprudence, as well as the best of our institutions, are derived ; and we can do it with uncommon advantage. Within the last forty years, the principles of law, as taught in their Courts of Equity, have been cultivated with great talent, and methodized and explained with great success. During that interval of time, their Courts of Equity have had a succession of learned men to preside in them, who have shed light on this portion of municipal law, and enriched it with their wisdom. It cannot, I presume, be seriously expected, or even wished, by the liberal counsel who argued this cause, that I should confine my researches to the more loose, inaccurate, and scanty repositories of equity learning of a date prior to our revolution, and that I should shut my eyes upon the improvements and lights of the present age. Within the period I have referred to, I may be permitted to mention, without meaning any invidious comparisons, that we have the results of the vast labours and eminent discretion of Lord *Eldon*, and are equally instructed by the enlightened judgment of Sir *Wm. Grant*, and the great diligence and accurate learning of Lord *Alvanley*. Within the same peroid we have, also, to borrow a portrait from *Gibbon*, " the majestic sense of *Thurlow*, and the skilful eloquence of *Wedderburne*." Least of all, ought a complaint to be made against the application of the existing *English* law to this case, for the parties litigant are *British* subjects, resident in *England*, and several of them of very distinguished rank.

It will, however, be found, upon further inquiry, that these later decisions are not introductory of any new rule

1817.

CUMBERLAND
v.
CODRINGTON.

**1817.**

CUMBERLAND
v.
CODRINGTON.

or principle of equity, but are only the application of principles long antecedently known and declared. This I will now undertake to show, for I admit that the parties are entitled to have the case decided according to the existing law *of this court*, though that law should happen to be different from what is now understood to be the rule at *Westminster Hall.*

To begin with *Pockley* v. *Pockley*, (1 *Vern.* 36.) which came before Ch. *Nottingham*, in 1681. The testator, in that case, had purchased an annuity out of mortgaged lands, and taken an assignment of the mortgage to protect his purchase; and, by his will, he directed the mortgage debt, among others, to be paid out of his personal estate. The question was between the representatives of the personal and real estates; and the Chancellor directed this debt to be paid out of the testator's personal estate, by reason of the express direction in his will. This case shows, that at that early day, the purchase of land, subject to a mortgage debt, did not make the debt personal; and that it required an express declaration, by will, to charge the personal assets with it. But I cite the case principally for the observations made by the counsel upon the argument, and which may be considered as evidence of the rule as then understood. The counsel observed, by way of illustration, that if a man purchased an equity of redemption, he must hold the land subject to the debt; but the debt never charged his person, nor did it, in any sort, become his proper debt.

So, again, in *Coventry* v. *Coventry*, (9 *Mod.* 12. 2 *P. Wms.* 222. *Str.* 596.) Earl *Gilbert* had an estate for life, with power to settle a jointure on his wife; and he covenanted to settle lands according to the power, and died before the power was executed. The plaintiffs brought a bill against the heir to have a specific execution of the power. Lord *Macclesfield*, with the assistance of two judges, held, "that the assets of Earl *Gilbert* should not

come in exoneration of the settled estate, for wherever assets are brought in exoneration, *there the debt originally charged the personalty.* The *covenant* remained as a real lien on the settled estate, and there could be no application of the personal estate, since there was no *debt* of which the personal estate was to be exonerated."

Here the general principle pervading all the subsequent cases, was strongly and distinctly declared.

In *Bagot* v. *Oughton,* (1 *P. Wms.* 347.) the ancestor mortgaged his estate, and died. His daughter and heir married *B.*, who, by fine, settled the estate on her and her husband, and he joined in an assignment of the mortgage, and *covenanted* to pay the money. It was held by Lord Ch. *Cowper,* that the personal estate of the deceased husband was not liable to be applied in ease of the mortgaged premises, for the covenant was only an additional security for the satisfaction of the lender, and was not intended to alter the nature of the debt.

That case goes as far as any of the modern cases. The husband had there become jointly seized of the estate, and he deals with the mortgagee, by his personal covenant to pay, and still the order of the funds was not affected.

The subsequent case of *Evelyn* v. *Evelyn,* (2 *P. Wms.* 659.) is equally strong, and it had great sanction; it adhered to such strictness, in preserving the *original* character of the two funds, as even to shake the resolution of Lord *Thurlow.*

In that case *G. E.* mortgaged the land for 1,500*l.*, and his son *G. E.*, afterwards *covenanted with the assignee of the mortgage* to pay the money. He succeeded to the premises, by settlement, after the death of his father, and died intestate. The question was, whether his personal estate should be applied to pay off the mortgage executed by his father, in consequence of the covenant he made. It was held by Lord Chancellor *King,* assisted by the Chief Justice of the K. B., and the Master of the Rolls, that

**1817.**

CUMBERLAND
v.
CODRINGTON.

the son's personal estate was not to be charged, for it was still the father's debt, and the covenant of the son was to be considered only as a surety for the land, which was the original debtor.

Lord *Thurlow*, in *Ancaster* v. *Mayer*, (1 *Bro.* 454.) seemed inclined to think, that in that case, the son by his covenant had made the debt his own, and he supposed the idea of the court must have been, that the covenant was by way of accommodating the charge, and not of making the debt his own. But there are so many cases, and even some decided by Lord *Thurlow*, in which a mere bond or covenant to the mortgagee will not, of itself, and without other circumstances, shift the charge, that I see no ground for surprise at this commanding decision.

In *Leman* v. *Newnham*, (1 *Vesey*, 57.) the same decision was given. An estate descended to a son, incumbered with a mortgage, and he *covenanted with the assignee of the mortgage to pay it*, and died. It was held by the Master of the Rolls, on the authority of the cases of *Bagot* v. *Oughton*, and *Evelyn* v. *Evelyn*, that the personal estate of the son was exempted, and that it was still the ancestor's debt.

We come next in the order of time, to the case of *Parsons* v. *Freeman*, (*Amb.* 115. 2 *P. Wms.* 664. note.) which seems to have been much relied on by the counsel for the plaintiffs, though I cannot perceive that it disturbs, in any material degree, the general current of authority.

The case is very loosely and imperfectly reported, and if Lord *Hardwicke* is not made to speak with the precision with which he usually thought, it must be imputed to the deficiency of the case, which gives us no facts, and a very brief note of an opinion : he says, that if the ancestor has done no act to charge himself personally, the heir at law must take the estate *cum onere.* So, if one purchase the equity of redemption, *with usual covenants to pay off the mortgage*, he knows of no determination upon such a case, but is inclined to think the heir could not come to have

the estate exonerated. Then, he adds, that such was not the case before him, which was an agreement with the vendor for the purchase of an estate for 90*l.*, of which he agreed to pay 86*l.* to the mortgagee, and 4*l.* to the vendor; and he thinks, in that case, the words were sufficiently strong, by express contract to pay, to show an intention to make the debt his own, and the heir was entitled to the application of the personal estate.

I have already observed, that such a special agreement between the purchaser and seller of the equity of redemption, by which the mortgage debt is considered as so much money left in the hands of the purchaser for the use of the mortgagee, would seem to be sufficient ground for a suit at law by the mortgagee. If so, this case is directly within the principle of *Tweddell* v. *Tweddell*; and Lord *Thurlow* is said, (3 *Vesey*, 131.) even to have approved of that decision. But the case is certainly of no use to the present plaintiffs, as Lord *Hardwicke* admits, that the purchase of an equity, *with covenants to pay off the mortgage*, does not make the debt personal; and in the case before me, it is again to be repeated, there is nothing more than a covenant of indemnity. I have no doubt, that if we were in possession of all the facts in that case, we should discover some special circumstances which took it out of the general rule. As it now stands, it is repugnant to most of the cases which preceded and followed it. The *mere covenant with the vendor to pay the mortgage debt, does not shift the charge from the fund primarily liable.* Most of the cases do not give that effect even to a covenant with the mortgagee. There must be circumstances in addition to the covenant. Lord *Hardwicke* himself so decided, shortly after the case of *Parsons* v. *Freeman.* Thus, in *Lewis* v. *Nangle*, (*Amb.* 150. 2 *P. Wms.* 664. note.) an estate came to the wife incumbered with a mortgage debt. The husband borrowed money, by bond and mortgage on the wife's estate, and she joined in the mort-

gage, as the money was partly for the husband's use, and partly to discharge her debts, *dum sola.* *The husband gave a bond, and also covenanted to pay the whole monies secured by the mortgage.* But Lord *Hardwicke* considered the land as still the primary fund, and he would not compel the husband to exonerate the land. He presumed the intention was otherwise.

*Forester* v. *Leigh,* (*Amb.* 171. 2 *P. Wms.* 664. note.) is a strong decision of Lord *Hardwicke* to the same effect. The testator purchased several estates subject to mortgages, with regard to one of which he covenanted to pay the mortgage money; and as to another estate under the mortgage, he purchased only *part* of it, and he and another purchaser *covenanted* to pay their respective shares, and indemnify each other. It was held, as between the legatees of the personal, and the devisee of the real estate, that these covenants did not make the mortgages personal debts of the testator. That was not the purpose of the covenants.

But the case of the Earl of *Belvedere* v. *Rochfort,* (6 *Bro. P. C.* 520.) is thought to have established a rule much more favourable to the heir than that declared in many of the cases, and the counsel for the complainants seemed to place much reliance upon its application, as well as upon its authority.

The case was this; *Hughes,* in 1706, mortgaged lands in *Ireland* to *Proby,* to secure a debt of 450 pounds, with interest. In 1707, *H.* sold his equity of redemption to Lord *Rochfort* for 900 pounds, and in the covenant of warranty, he excepted the mortgage, and the deed stated that the mortgage debt and interest were to be paid and discharged by *Rochfort* out of the consideration of 900 pounds. On the back of the deed, there was also indorsed a receipt for the 900 pounds, in this manner, viz. " 450 pounds on the perfection of the deed, and 450 pounds allowed on account of the mortgage."

Lord *Rochfort* never paid the debt; and in 1726, he made his will, and gave a large personal estate to his wife, and he also devised the mortgaged premises to her for life, and then to his eldest son *George Rochfort*, in fee, subject to certain debts and legacies. He declared that his wife was to hold the land devised to her free of the mortgage debt and every incumbrance during her life, and he directed that his son *George* should pay the interest of that mortgage debt out of other lands devised to him. After giving some pecuniary legacies, he bequeathed the rest of his personal estate, *after payment of all his just debts*, and all his real estate, to his son *George*, and made him sole executor.

1817.

CUMBERLAND
v.
CODRINGTON.

*George*, the son, proved the will after his father's death, and he kept down the interest on the mortgage debt, but never paid the principal. His mother, also, released to him her life estate in the mortgaged premises. In 1730, he made his will, and gave small annuities to his younger sons; the mortgaged premises he gave, according to such estate as he had therein, to his youngest son, *William Rochfort*; and he gave the principal part of his estate, real and personal to his eldest son *Robert*, afterwards Earl of *Belvedere*. The provision for the youngest son, and the other children, was very small. The estate left to the eldest son was immense.

After the death of *George*, the elder brother whose income, at that time, was 3,800 pounds sterling a year, refused payment of principal or interest of the mortgage debt charged on the land devised to the youngest brother; and the younger brother being under straightened circumstances, and with an increasing family, was unable to keep down the interest, and at last, in 1739, the mortgage was foreclosed, but the estate by the humane indulgence of the creditor, was not sold under the decree, until the year 1756. The younger brother, at last, filed his bill against the executors of his father, (of which his elder brother was one,) and of his grandfather, to have the mortgage debt

1817.

CUMBERLAND
v.
CODRINGTON.

paid out of the personal assets, in ease of the land de-
vised to him.    The bill was originally filed in 1749, in the
Court of Chancery in *Ireland*, and the final decree was pro-
nounced by Lord Ch. *Lifford*, in 1770.

The Lord Chancellor decreed, that the mortgage debt
was to be considered the debt of Lord *Rochfort*, the grand-
father, at the time of his death ;  and that his personal
estate, in the hands of his son and heir, *George*, and which
since came to the hands of his grandson, *Robert*, Earl of
*Belvedere*, was liable to the payment of that debt, in ex-
oneration of the real estate devised to *William*, the plain-
tiff.

This decree was affirmed, on appeal, by the House of
Lords.

The simple narration of this case is exceedingly calcu-
lated to enlist the feelings in favour of the decree, and
every person would naturally be tempted, by the interest
and pathos of the story, to press every circumstance to the
greatest extent for the relief of the younger brother.  But
hard cases often make bad precedents, and it is certain
that this case has never since been regarded as a safe and
sound authority.   Lord *Thurlow* rejected it, though he was
one of the counsel for the respondents upon the appeal.
Lord *Alvanley* says, there are many difficulties occurring
against the judgment, and  he does not rely upon it ; and
Lord *Eldon*, and Sir *Wm. Grant*, take no notice of it in
their criticisms and discussions on this much agitated sub-
ject.

It is impossible to know upon what precise grounds the
decree was placed by the House of Lords.   The counsel
for the respondents relied upon the fact  contained in the
deed of the purchase of the equity of redemption by Lord
*Rochfort*, that the mortgage debt was expressly ascertained,
and set apart, and left in the hands of the purchaser, to
be by him paid to the mortgagee.  Lord *Lifford*, sems to
have considered this fact as decisive evidence, that Lord

*Rochfort* made the debt his own personal debt, and this, probably, was the ground of his decree. If it was considered that an action of law might have been brought by the mortgagee upon the affirmance of this trust, then the case would come directly within the principle of *Tweddell* v. *Tweddell.* But the counsel for the respondents urged other reasons, founded on the will of the original purchaser, as if he had there made the debt chargeable on his personal · assets. If that was the fact, then the case fell within the decisions in *Pockley* v. *Pockley,* and of numerous other cases to the same purpose. There is strong ground for this construction, as the testator gave the mortgaged premises to his wife for life, free of this incumbrance; and he directed his son and executor to pay the interest of that debt out of other lands devised to him. If he intended, or expected, that the mortgage debt was to be paid in the lifetime of his widow, (and he had no right to expect the contrary,) then the testator certainly intended it should be paid out of his personal estate, and this conclusion is the more inevitable, since he gave the residuary personal estate to his son, *after the payment of all his just debts.*

But the counsel for the respondents urged other grounds, also, in favour of the decree. They urged the will of *George Rochfort,* the son, (and father of the parties to the suit,) as decisive evidence of *his* intention, also, that the mortgage debt was to be paid out of the personal assets of his father or of his own. He gave specific estates to his other younger sons, and gave the rents and profits of certain lands, including the premises, for the maintenance of his younger sons, until they were 25, and he then gave the mortgaged premises, and them only, to his youngest son. He must have intended *it* as a beneficial devise, and which could not be the case with the incumbrance upon it, for that eventually swallowed it up.

Which of these grounds were taken by the Court in the last resort, whether it was the original agreement at the

1817.

CUMBERLAND
v.
CODRINGTON.

time of the purchase, or the will of the grandfather, or the will of the father, cannot be ascertained. We have not the reasons either of Lord Ch. *Lifford*, or of the Court of Appeals, and the case may perhaps be considered as turning upon the construction of a will, and its very special provisions. A case so peculiar, and so destitute of precision, cannot surely be received as an authority here, when it is no longer regarded as such by the tribunals of the country in which it was pronounced.

*The purchaser, by express directions in his will, may throw the incumbrance upon the personal assets, or by dispositions and language equivalent to an express direction.*

The result of the cases seems to be, that as to wills, the testator may, by express directions, charge such an incumbrance upon his personal assets, or even without express words, he may do it by dispositions and language that are tantamount; as if, for instance, the continuance of the charge primarily on the land would be repugnant to some of the privisions in the will, and defeat them.

As to other acts of the purchaser in his life time, in order to charge his personal estate as the primary fund, he must make himself, by contract, personally and directly liable at law for the debt to the owner of the incumbrance; and even a covenant or bond for the purpose will not be sufficient, unless accompanied with circumstances showing a decided *intention* to make thereby the debt personally his own.

There is, then, no pretence, on any ground, or, indeed, from any case, to charge the personal assets of the estate of Sir *W. P.* with the mortgage debt. He died intestate, and the Countess of *Bath* succeeded to his whole estate, real and personal, as his only child.

The next question is, whether the personal estate of the Countess of *Bath* is to be charged with this debt, or whether it must not be left as primarily chargeable upon the land which descended to her heir at law.

In my opinion, there is as little ground in this case, as in the other, to shift the charge from the real to the personal estate.

The will of the Countess of *Bath* does not touch the case, and the inquiry is, did her acts in her lifetime create the charge on her personally?

I do not perceive a single act of hers creating any responsibility from her to the owner of the mortgage debt. She wished to pursue the course marked out by her father, and to make her *American* estates exonerate themselves, by the progressive sales, from the debts charged upon them. She seems to have acquiesced in the acts of her agent, in keeping down the interest of the debt in question; but what is that to the point? She owned all the funds, both real and personal, and her property was liable, according to the nature of the charges, for all the debts; no inference can be drawn, one way or the other, as to the matter before us, from her general desire to discharge all the debts upon her estates. The cases I have been reviewing, require some decided and marked act of assumption of the very debt in question, by making it a debt of primary personal obligation. The only communication from her, or act of hers, on this subject, is her letter to Mr. *Troup*, of the 15th of *February*, 1806. But that letter is not to the owner of the mortgage. It is directed to her agent, and contains nothing more than an anxious inquiry as to the competency of her *American* funds to meet the debt. The letter bound her to nothing; it is not so strong an act as the covenant of indemnity entered into by her father. When Mr. *Troup*, afterwards made an agreement with Mrs. *Foster*, as owner of the mortgage, to pay the same, in consideration of forbearance to prosecute, " out of the proceeds of the *Pulteney* estates under his administration and agency," he did an act for which no authority is to be found in the case. In his capacity of administrator of Sir *W. P.*, he had no authority to bind his personal assets, for a debt not chargeable upon them before; and as general agent for the Countess of

*Bath,* he was not authorized to bind her personally for a debt chargeable only on the land descended to her as heir.

It would be dangerous to the relation of principal and agent, to infer such authority from loose general circumstances, susceptible of other constructions.

Even if the personal estate of Sir *W. P.* had been bound for the debt, that fact would not have bound the personal estate of his daughter, after a second descent cast, because it was never her personal contract. This was so said in *Cope* v. *Cope,* (2 *Salk.* 449.) and by Lord *Eldon,* in *Waring* v. *Ward,* (7 *Vesey,* 336.)

Upon the whole, there appears to be less colourable ground for charging the personal estate of the Countess of *B.* than for charging that of her father; and my conclusion from the whole case is, that the bill must be dismissed.

The following decree was entered : " This cause having been submitted upon a case agreed to by the parties, and upon the arguments of counsel thereon, as well on the part of the defendants, as of the complainants, and due deliberation being thereupon had, and it appearing that the complainants are not entitled to the personal estate, either of the late Sir *Wm. Pulteney,* or of the late Countess of *Bath,* in the pleadings mentioned, in exoneration of the land from the mortgage debt in question : It is thereupon ordered, &c. that the complainants' bill be dismissed, and that no costs be charged by either party as against the other."

Bill dismissed.